# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| TCF NATIONAL BANK, | Civil No. 11-2717 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| MARKET INTELLIGENCE, INC., FIDELITY NATIONAL INFORMATION SERVICES, INC.,  LSI APPRAISAL, LLC, and LENDER PROCESSING SERVICES, INC., | |
| Defendants. | |

Brian Melendez, **DYKEMA GOSSETT, PLLC**, 90 South Seventh Street, Suite 4000, Minneapolis, MN  55402, for plaintiff.

Glenn R. Reichardt, **K&L GATES LLP**, 1601 K Street N.W., Washington, DC  20006; and Donald G. Heeman, **FELHABER LARSON**, 220 South Sixth Street, Suite 2200, Minneapolis, MN  55402, for defendants.

TCF National Bank ("TCF") brings this action against Market Intelligence, Inc. ("Market") and other alleged potential successors in liability to Market (collectively, "Defendants") regarding a service TCF purchased from Market as a less-expensive alternative to appraisals, known as a Field Asset Verification ("FAV").  TCF brings this action seeking to recover damages for what it claims are losses caused by the shortcomings of Market's FAVs.  The Court has previously issued two rulings in this case.  In July 2012, the Court issued an order dismissing without prejudice several of TCF's claims but permitting others to proceed.  TCF then amended its complaint and

Defendants again moved to dismiss.  In a January 2013 order, the Court denied the motion on all claims.  There are now six claims before the Court: (1) fraudulent inducement, (2) negligent appraisal, (3) breach of contract, (4) breach of the covenant of good faith and fair dealing, (5) fraud, and (6) consumer fraud.

Defendants now move for summary judgment on all claims, arguing both that all claims are barred by the six-year statute of limitations under Minnesota law and that Defendants are entitled to summary judgment on the merits for each of the six claims. TCF also moves for summary judgment, but only on its claims for fraudulent inducement, fraud, and consumer fraud and on Defendants' affirmative defenses.  Also before the Court is Defendants' motion to exclude the testimony of TCF's expert witness. The Court concludes that all of TCF's claims are barred by the statute of limitations, as the evidence indicates that TCF was aware of the inadequacies of FAVs by at least 2004, which is more than six years before it filed its complaint in 2011, and there is no evidence upon which a reasonable jury could conclude that TCF is entitled to any tolling of the statute of limitations.  The Court will thus grant Defendants' motion for summary judgment, deny TCF's motion for partial summary judgment, and deny as moot Defendants' motion to exclude TCF's expert.

## BACKGROUND

### I.    PARTIES

Plaintiff TCF is a national banking association which loans money to consumers for residential mortgages in Minnesota and other states.  (Aff. of Douglass Hiatt ¶ 2, May 1, 2014, Docket No. 61.)  Defendant Market Intelligence, Inc. was a company

incorporated in Massachusetts, but ceased to exist in 2004 when it merged into Market Intelligence, LLC, which ceased to exist in 2005 when merged into its parent company, Fidelity National Information Solutions, Inc. (Decl. of Brian Melendez, Ex. I at 6, May 1, 2014, Docket No. 62.) Defendant Lender Processing Services, Inc. is a wholly owned subsidiary of Fidelity National Information Services, Inc., and Defendant LSI Appraisal, LLC is a wholly owned indirect subsidiary of Lender Processing Services, Inc. (*Id.*) These mergers and corporate identities are not material to the instant dispute.

## II.     AGREEMENT TO PURCHASE FAVS

TCF initially began purchasing FAVs from Market for its consumer mortgage lending activities in Illinois in 2000. (*See* Ex. to Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Ex."), Ex. 25 (Dep. of Mark Rohde ("Rohde Dep.")) 19-20, May 1, 2014, Docket No. 74; *id.*, Exs. 1-2.)[1]  In late 2001, Timothy Meyer, then-director of consumer lending for TCF in Minnesota, spoke with Mark Rohde, who held a similar role with TCF in Illinois, about TCF's experience in Illinois. (*See* Defs.' Ex., Ex. 28 (Dep. of Timothy B. Meyer ("Meyer Dep.")) 5, 9-11.) Based on this discussion, Meyer recommended to his superiors in December 2001 that TCF order FAVs from Market for use in Minnesota. (*Id.* at 29-30.)

---

[1] Defendants filed evidentiary exhibits in support of their motion for summary judgment as two separate docket entries titled "Exhibit" following their memorandum. The Court will refer to this set of documents in its entirety as "Defs.' Ex." and will specify the relevant attachment number when citing to individual exhibits within the set. Except for depositions and unless otherwise noted, page numbers refer to the CMECF pagination.

Meyer then negotiated an Agreement to Purchase Services ("Agreement") between TCF and Market on June 11, 2002.  (*Id.* at 31-32; *see also* Melendez Decl., Ex. D ("Agreement to Purchase Services").)  He does not remember with whom he spoke at Market before signing the contract.  (Meyer Dep. 12-13, 31.)  The record indicates that, before entering into the Agreement, TCF ordered 13 test FAVs for properties in Minnesota in December 2001.  (Decl. of Lisette C. Howells ¶ 3(c), May 1, 2014, Docket No. 75.)

Much of the dispute surrounding the merits of TCF's claims centers on what Market represented was involved in an FAV.  The Agreement defined an FAV as follows:

> The FAV is a residential real property evaluation derived from a process that combines an external data source value (previous appraisal, automated estimate, prior sales price, etc.) with a "drive-by" exterior inspection of the subject property by an agent licensed in residential real estate in the state in which the property is located. The agent, *who may be an appraiser but is usually a real estate agent*, also provides at least one comparable sale, and other local market data. This product is intended primarily for use in consumer/home equity lending and the second mortgage market. The Field Asset Verification is not an appraisal and does not include either (a) a physical inspection of the interior of the subject property, or (b) photographs of the interior or exterior of the property, although photographs will be provided on request as will additional market data such as active listings.

(Agreement to Purchase Services 3-4 (emphasis added).)  The Agreement also distinguished between appraisals and other "evaluation" products, which included FAVs:

> **Evaluation** shall mean the act or process of estimating value; an estimate of market value of residential real estate based upon some or all of the following: information obtained from TCF and/or the owner of the subject property, available public records, available market data, and/or a field inspection conducted by a real estate professional **who may or may not be an appraiser.  Evaluations are not appraisals** and do not necessarily

comply with USPAP . . . . While these estimates of market value are derived from sources that MI believes to be reliable, in no case does MI represent or warrant that an evaluation represents actual market value.

(*Id.* at 2 (emphasis added).)

## III.   PRE-CONTRACT DISCUSSIONS AND PREPARATIONS

In supports of its claims that Market induced TCF into purchasing FAVs on the basis of misrepresentations as to their quality, TCF points to several representations and pieces of marketing materials upon which it claims to have relied in agreeing to purchase FAVs from Market.

### A.   The Hybrid Approach

TCF focuses most significantly on one piece of marketing material called "The Hybrid Approach to Collateral Evaluation: Artificial Intelligence and Street Smarts" ("The Hybrid Approach").  (*See* Melendez Decl., Ex. A ("The Hybrid Approach").)  TCF points to one portion of The Hybrid Approach in particular:

QUALITY CONTROL

Market Intelligence understands that our clients rely on our property evaluation and appraisal products to make important financial decisions. The estimates of market value which we provide are an integral part of both the loss mitigation process, and collateral underwriting for consumer lending.  Quality is a function of teamwork, all hands in the organization working together focused on the same goal; serving the client.  Quality Control begins with the careful selection and supervision of our field agents and continues through a **100% review process by qualified real estate analysts and appraisers** . . . . The Market Intelligence Quality Control Policies and Procedures Manual, which thoroughly outlines the Market Intelligence Property Evaluation Quality Assurance Program and the Market Intelligence Appraisal Quality Assurance Program, is available upon request.

(*Id.* at 17 (emphasis added).)   TCF's arguments rely most significantly on the portion in emphasis – that qualified real estate agents and appraisers were involved in a quality review process for FAVs.  It also points to another, similar statement in The Hybrid Approach:

> 100% QUALITY REVIEW:
> All evaluations and appraisals are reviewed for quality as part of the MI process.  Field work is reviewed and signed off by a qualified real estate appraiser.  Random audits of field data are also conducted as part of an ongoing review process.

(*Id.* at 4.)  The Hybrid Approach also contains language stating that "[w]ith over 15,000 appraisers and real estate professionals, and its proprietary vendor management system, [Market] can deliver a wide range of collateral evaluation products within competitive time frames," and includes a chart comparing different valuation products, in which "FAV drive-by" is distinguished from "Appraiser drive-by."  (*Id.* at 2, 5.)

TCF points to deposition testimony indicating that, in contrast to the statement in The Hybrid Approach that its "estimates of market value" are put "through a 100% review process by qualified real estate analysts and appraisers," (The Hybrid Approach 17), FAVs were not reviewed or quality-checked by a licensed real estate appraiser. Market's manager of quality control for evaluation products testified in her deposition as follows:

> Q:  [W]as there any point in the FAV review process for the FAVs that were produced by TCF that involved an appraiser?
> A:  Not - for the FAVs for TCF, not in the - they - you know, no appraisal license. These were not the appraisal product.  They were an alternative product.  I'm not aware of appraisers.

(Melendez Decl., Ex. S (Dep. of Ellen Silverstein) 56-57.)

### B.  Evidence of Reliance on the Hybrid Approach

TCF argues that its "assent to the Agreement was induced by" these statements in The Hybrid Approach and that "TCF would not have entered into the Agreement but for" these statements.  (Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. at 4, May 1, 2014, Docket No. 60.)  In support of this claim, it cites to the affidavit of its in-house counsel and Chief Compliance Officer, Douglass Hiatt.  (*See* Hiatt Aff. ¶ 7 ("TCF's assent to the Agreement was induced by Market Intelligence's false statements.  TCF would not have entered into the Agreement but for Market Intelligence's false statements.").)

It is not entirely clear how and when TCF obtained The Hybrid Approach.  Hiatt testified that he had two copies of The Hybrid Approach in his file, one of which he received from Meyer.  Hiatt testified that he received that copy in December 2001 when Meyer asked him to review the contract and that while he was negotiating the contract he "would have had the materials and . . . scanned through them, yes."  (Melendez Decl., Ex. T (Dep. of Douglass Hiatt ("Hiatt Dep.")) 274-75.)  Tim Meyer testified that he recalled seeing some documents that he received in 2001 or 2002, although he was not entirely sure which materials.  (Meyer Dep. 88-89.)  He testified that what he recalled standing out from the marketing materials in connection with TCF's "retention of Market" was:

> Probably the biggest thing that I recall is them talking about that they have this network of 15,000 appraisers and real estate professionals who are the ones that do their FAV inspections. And I placed a lot of reliance on it. It wasn't just anybody, it was a real estate professional or appraisal (sic) was physically driving by the property to validate the value.

(*Id.* at 89.)  This appears to be a reference to a portion of The Hybrid Approach, although Meyer also stated he believed the marketing materials he received in 2001 contained a price list, (*id.* at 21-23), and there is no price list in The Hybrid Approach.

## IV.   TCF'S CONCERNS ABOUT FAVS

Not long after executing the Agreement, TCF noticed problems with the FAVs it purchased from Market.

### A.   Mara Letter in 2002

TCF first raised concerns about FAVs with Market on August 29, 2002, when Meyer sent a letter to Ted Mara at Market regarding a discrepancy TCF discovered between a property's FAV and appraisal value.  The letter stated:

> Attached is a Field Asset Verification done by Market Intelligence in August 2002.  This account was caught by one of my Regional Managers and raises some questions that I hope you can shed some light on . . . . A customer purchased the property one year ago for $149,000 and the county assessed tax value is $120,000.  The customer estimated the property value at $235,000 and TCF subsequently ordered a FAV.  The FAV came back at a value of $210,000 . . . . We acknowledge that Minnesota has had higher than normal appreciation as compared to other markets in the country, but given the significant value increase, my Regional Manager, at our own expense, ordered a full appraisal on the property which subsequently was completed and valued the property at $165,000 . . . . I would appreciate it if you could help us reconcile the significant difference between the FAV value and the appraisal.  It seems unlikely that there would be this much disparity in the values, since in the FAV process, a real estate broker or appraiser is actually the one doing the driveby.  I would appreciate a response in writing such that we can continue to have comfort level [sic] with the quality of work that Market Intelligence does in our market.

(Melendez Decl., Ex. E.)  Meyer testified that Mara did not respond in writing but that he recalls "[t]hat [he] received a phone call from [Mara] and describing this as an aberration,

reassuring [Meyer] on the quality review process that [Market has] reinforcing the soundness of [Market's] work." (Meyer Dep. 49.)  Neither party has produced any notes taken during that phone call.  Although TCF has not established Hiatt's personal knowledge of this phone call, Hiatt stated in his affidavit that Market "responded to Mr. Meyer's letter by assuring TCF that Market Intelligence was not engage in practices that would produce a 'significant difference between the FAV value and the appraisal' in other cases." (Hiatt Aff. ¶ 15 (it is not clear what Hiatt is quoting).)  TCF argues that this response was fraudulent and the proper response for Mara to make at this time would have been to explain that no appraisers were involved in the quality review process. (Pl.'s Mem in Supp. of Mot. for Partial Summ. J. at 23-24.)  TCF also asserts that Market "intended to induce TCF's continued reliance upon Market Intelligence's assurances so that TCF would keep ordering Field Asset Valuations." (Hiatt Aff. ¶ 16.)  According to Meyer, Mara's statements to him in that call convinced Meyer to continue using Market's FAVs for nearly three years after the phone call: when asked if he was satisfied with Mara's response, he answered "[y]es.  That's why we continued to use him." (Meyer Dep. 57.)

## B.    Developments in 2004

Beginning in early 2004, borrowers began to approach TCF to refinance their loans to account for appreciating real estate prices in Minnesota, which required full appraisals. (*Id.* at 52-53.)  This led TCF to discover significant discrepancies between FAV and appraisal values for many properties, with FAV values being consistently higher than the appraisal value. (*Id.* at 53.)  Meyer testified that:

One of the things that we saw in early 2004 is that loans where we had originated them using the FAV to start with, it may be up against the dollar threshold, that we had to do a full appraisal, that we began to see appraisal values coming in significantly different, lower, than what we saw for the FAVs at the time we originated some loans. . . . So I originate a loan to you in 2002.  The FAV said your house is worth a hundred thousand.  In the beginning of 2004 you say I want to increase my loan, maybe I want to go up to a hundred percent loan to value, and then we say okay, we're going to do an appraisal on the house and the appraisal came in at 50,000.

(*Id.* at 52-53.)   He testified that this information came to his attention from regional managers in their normal course of approving loans.  (*Id.* at 53.)  He said that when such concerns were brought to his attention,

[t]ypically what I would do is at that point in 2004, whenever that started, I just use the phrase early, became concerned about whether or not using QCEs or FAV was an appropriate way to value properties.  And so [we] began accumulating instances where there was that disparity in values, and then at some point in 2004 I did share that with our credit quality review area to ask for their input on that.

(*Id.* at 54.)

On July 8, 2004, an individual within TCF sent a memo to Meyer and copying other TCF personnel regarding AVM[2] and FAV valuation methods.  (Defs.' Ex., Ex. 10.) The memo states that "FAVs are the ones that had a majority of values in excess of 100%" and "only 52% of Market Intelligence's (MI) AVMs were less than 100%."  (*Id.*) The memo further states that "[t]he results suggest that HVEs are generally a good measure of value in Minnesota whereas the FAV finding supports the inclusion of that valuation method in a more conservative LTV matrix," and that [t]hese findings are

---

[2] An AVM is a product similar to an FAV, except that it does not include a drive-by or review by a qualified real estate agent or analyst.  (*See* The Hybrid Approach 7.)  Some AVMs are called "insured AVMs," which means there is some guaranty the value provided in the AVM is accurate.  (Rohde Dep. 55.) AVMs are not at issue in this case.

substantially different than what we found in our AVM study a couple of months ago."
(*Id.*)   The memo observes that the "reasons for the disparity are unclear, but may include . . . [d]ifferent models used by Market Intelligence for the two studies [AVM and FAV].  There is no obvious evidence of this but the large difference in results beg[s] the question."  (*Id.*)

Meyer testified in response to a question about why Powers sent this analysis, that "we had . . . begun to see properties where we had originated a loan using an FAV later than when we did appraisals, seeing significant disparities in values, and I believe I had sent him a summary of those loans showing the difference in values."  (Meyer Dep. 61.) When asked what he recalled doing after receiving the memo, Meyer responded "[t]he only thing I'll say is ultimately this culminated in us terminating our contract with Market Intelligence.  This whole process."  (*Id.* at 63.)  He agreed to a clarification that the "process" he referred to "began sometime early in 2004 and . . . continued to July of 2004 when you're finding what you've described as being differences between appraised values and prior FAVs," and explained that this finding led him to terminate the agreement with Market because he "just no longer trusted the FAV values" and had "ultimately lost faith in [FAVs] as a valuation method."  (*Id.* at 63-64.)  When asked whether he had any communication with anyone at Market about his loss of faith or to seek an explanation about the differences, he said no and explained, "[b]ecause I'd already had a conversation about my concerns, you know, in a prior year, and at that point, you know, my - my conclusions were based on fact, where there was so many disparities in values that I lost confidence and I really wasn't interested in hearing another

confidence speech or slick sales pitch about why that was still a good thing to use." (*Id.* at 64.)

Other evidence in the record includes a memo to Meyer dated September 8, 2005, which summarizes a file review in which the customer had a loan originating in 2003 with an FAV of $235,000, "based on the customer's estimated value of $75,000 at the time," for which TCF had recently received an appraisal of $142,000. (*Id.*, Ex. 12.) The memo observed: "[i]nteresting that the customer's estimated value would've ballooned to $275,000," and that "[it] is situations like these that validate our decision not to use ordinary automated property values and I believe using the insured automated valuation method has eliminated any risk of originating loans where we would be in a similar situation." (*Id.*)

On February 11, 2005, Meyer sent a letter to Market indicating that TCF would be terminating the agreement on June 11, 2005, pursuant to the Agreement. (Defs.' Ex., Ex. 11.) By the time of the cancellation, TCF had ordered 2,989 FAVs from Market Intelligence, which were used to initiate loans totaling $300 million. (Hiatt Aff. ¶¶ 13, 18-19.) Since then, TCF has continued to discover additional FAVs that it believes Market preformed improperly. (*Id.* ¶ 19.)

## V.   POST-CANCELLATION OF THE AGREEMENT

On August 11, 2008, an attorney for TCF sent a letter to Market labeled "Re: Claim of TCF National Bank for damages for breach of contract between Market Intelligence, Inc. and TCF National Bank," referring a "claim against [Market] for damages suffered as a result of [Market's] breach of the contract." (Defs.' Ex., Ex. 13 at

88.)  The letter described the factual basis for the claim as "mortgages that have been foreclosed upon, are in the process of foreclosure, or have such low actual value that TCF abandoned the property because it was not economically feasible to foreclose," that "TCF issued the loans secured by[]the mortgages . . . based on the appraisals provided through [Market]," (*id.*), and that "there is a very significant difference between most of the appraisals obtained through [Market] as compared to the appraised values TCF obtained from other appraisers after defaults on the mortgage loans." (*Id.* at 89.)  The letter states "I believe that the facts [in the spreadsheets] clearly establish that the appraisals obtained through Market Intelligence under the contract attached as Tab 1 were the result of gross negligence." (*Id.*)

On April 2, 2010, Claire Graupmann of TCF created a memo summarizing six FAVs and concluding that they were all performed in a grossly negligent manner. (Melendez Decl., Ex. G at 1.)  Specifically, she found that some of the FAVs used comparables that were significantly older than the subject property, ignored potential comparable sales within the same building or on the same street, and failed to consider damage to a house that was visible from the street.  (*Id*. at 2-3.)

## VI.   THIS ACTION

### A.   Procedural History

TCF filed this action on September 21, 2011, initially bringing eight claims against Defendants: fraudulent inducement, negligent appraisal, gross negligence, fraud, consumer fraud, deceptive trade practices, interference with business, and breach of the duty of good faith and fair dealing.  (Compl., Sept. 21, 2011, Docket No. 1.)  Defendants

moved to dismiss, and the Court dismissed without prejudice the gross negligence, consumer fraud, interference, and good faith and fair dealing claims. *See TCF Nat. Bank v. Mkt. Intelligence, Inc.* ("*2012 TCF Order*"), Civ. No. 11-2717, 2012 WL 3031220 (D. Minn. July 25, 2012).  TCF then filed its First Amended Complaint, bringing six claims: (1) fraudulent inducement, (2) negligent appraisal, (3) breach of contract, (4) breach of the covenant of good faith and fair dealing, (5) fraud, and (6) consumer fraud.  (First Am. Compl., Aug. 22, 2012, Docket No. 28.)  Defendants again moved to dismiss, seeking dismissal of the breach of contract, consumer fraud, and good faith and fair dealing claims, and the Court denied the motion. *TCF Nat. Bank v. Mkt. Intelligence, Inc.* ("*2013 TCF Order*"), Civ. No. 11-2717, 2013 WL 53837 (D. Minn. Jan. 3, 2013).

## B.    TCF's Arguments

With the claims now pending against Defendants, TCF generally alleges that Market induced it to purchase FAVs based on false representations – specifically the statement in the Hybrid approach regarding appraiser involvement in the quality review process – without which TCF would not have purchased FAVs from Market.  (*See* Pl.'s Mem. in Supp. of Mot. for Summ. J. at 4 (citing Hiatt Aff. ¶ 7).)  TCF alleges that the FAVs performed by Market ultimately "had grossly overestimated the value of properties whose mortgages were in default or foreclosure," and that these inflated values would have been caught by a "competent appraiser."  (*Id.* at 9 (citing Hiatt Aff. ¶ 19).)  TCF argues that these "inflated values in [Market]'s FAVs induced TCF to enter into loans that TCF would not have entered into if the values had been realistic," because without the inflated values, "the mortgages would not have qualified under TCF's underwriting

criteria." (*Id.* at 10 (citing Hiatt Aff. ¶ 20).)  These arguments are at the core of all six of TCF's claims.

### C.    Instant Motions

After the Court denied the second motion to dismiss, Defendants answered the amended complaint and alleged numerous affirmative defenses, including failure to state a claim, statute of limitations, and over a dozen other defenses.  (Defs.' Answer to Pl.'s Am. Compl., Jan. 17, 2013, Docket No. 41.)   Defendants now move for summary judgment on all of TCF's claims.  (Defs.' Mot. for Summ. J., May 1, 2014, Docket No. 70.)   TCF moves for partial summary judgment on its fraud-related claims – fraudulent inducement, consumer fraud, and fraud – against Defendants and on Defendants' affirmative defenses.  (Pl.'s Mot. for Partial Summ. J., May 1, 2014, Docket No. 58.)  Market also moves to exclude TCF's expert witness, Robert H. Strachota, on the grounds that his report contains legal conclusions, is premised on the incorrect contention that Market's FAVs were appraisals, fails to disclose the source of the information used in his report, and has not adequately described his methodology.  (*See* Mem. in Supp. of Mot. to Exclude Expert Testimony, May 1, 2014, Docket No. 65.)  The Court concludes that all of TCF's claims are barred by the statute of limitations, which is six years for each of its claims, and that no reasonable jury could find that TCF is entitled to any form of tolling.   The Court will thus grant Defendants' motion for summary judgment and decline to reach the merits of TCF's claims or the propriety of its expert, deny TCF's motion for partial summary judgment, and deny Defendants' motion to exclude TCF's expert as moot.

## ANALYSIS

### I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.   STATUTE OF LIMITATIONS

Defendants argue that all of TCF's claims are barred by the six-year statute of limitations.  They argue that TCF's fraud claims – fraudulent inducement, fraud, and consumer fraud – are barred because the evidence indicates that TCF discovered any basis for a cause of action before September 2005, which was six years before TCF commenced this action in September 2011.  They argue that TCF's contract-based claims – breach of contract and breach of the covenant of good faith and fair dealing – are barred because the contract terminated in June 2005 and there is no evidence of fraudulent inducement to support tolling the state of limitations.  Finally, they argue that TCF's claim for negligent appraisal is barred because under the applicable damages rule,

damages on account of any negligent appraisal would have occurred before September 2005.

TCF does not address Defendants' arguments about when the statute of limitations would begin to run for each of its claims or types of claims under Minnesota law, but rather argues that the statute of limitations should be tolled for all of its claims on the basis of fraudulent concealment. TCF claims that it exercised due diligence with Meyer's inquiry to Mara in 2002 about the single incidence of disparity but that Mara's response fraudulently convinced TCF that there were no problems with Market's FAVs, such that "TCF did not begin to suspect" that the FAVs were significantly different from appraisal values until 2010, and "did not learn about it in fact until discovery in this lawsuit in February 2014." (Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 5-6, May 22, 2014, Docket No. 78.)

The Court will first set out the applicable statute of limitations for each of TCF's claims. Then, because TCF does not appear to dispute Defendants' arguments regarding when those statute of limitations began to run under Minnesota law, the Court will address those issues only briefly. The Court will then turn to TCF's argument that all of those statute of limitations periods should be tolled on account of fraudulent concealment.

### A.   Applicable Statue of Limitations

As the Court explained in its order on Defendants' first motion to dismiss: "A six-year statute of limitations governs fraud and certain tort claims in Minnesota" and applies to "contract actions and actions based upon a liability created by statute." *2012 TCF*

*Order*, 2012 WL 3031220, at \*2 (citing Minn. Stat. § 541.05, subd. 1(1) (contracts), subd. 1(2) ("liability created by statute"), subd. 1(6) (fraud-related claims)); *see also Hope v. Klabal*, 457 F.3d 784, 790 (8th Cir. 2006); *Christian v. Birch*, 763 N.W.2d 50, 56 (Minn. Ct. App. 2009) (negligence claim); *Drobnak v. Andersen Corp.*, Civ. No. 07–2249, 2008 WL 80632, at \*4 (D. Minn. Jan. 8, 2008) (consumer protection claim). Thus, each of TCF's claims is subject to a six-year statute of limitations. When the limitations period begins to run depends on the type of cause of action. The Court will discuss each in turn.

### 1.    Fraud Claims

Under Minnesota law, the "discovery rule" applies to fraud and fraud-related claims, under which "the limitations period begins to run 'when the facts constituting fraud were discovered or, by reasonable diligence, should have been discovered.'" *Hope*, 457 F.3d at 790 (quoting *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985)).

TCF's fraud and fraud-based claims are based on the 2002 statement in The Hybrid Approach that "field work" is reviewed for quality control by real estate appraisers. Market argues that the statute of limitations has run on this claim because, under the discovery rule, TCF discovered or could have discovered with reasonable diligence before September 2005 that appraisers did not actually review the FAVs as part of the quality review. Market argues that TCF had sufficient concerns about the accuracy of FAVs in 2002, 2004, and 2005 and, besides the letter to Mara in 2002, failed to exercise reasonable diligence in investigating the possible problems with the FAVs.

A jury could reasonably conclude that TCF did not actually discover before September 2005 that appraisers were not actually involved in the development of FAVs. There is no evidence in the record suggesting that TCF was aware of this particular fact before 2010. But given TCF's obvious concerns about the accuracy and reliability of FAVs in 2004 and 2005, which ultimately led it to cancel its Agreement for purchase of FAVs from Market, TCF faces an uphill battle in demonstrating that reasonable diligence would not have revealed this information. The record indicates that as early as 2004, Meyer received a memo suggesting that FAVs were consistently inaccurate, and Meyer testified that this internal investigation into the reliability of FAVs ultimately led TCF to cancel its Agreement with Market. But Meyer also testified that he made a conscious decision to **not** investigate the accuracy of FAVs with Market at that time because he had already "lost faith" in FAVs. (Meyer Dep. 63-64.) Although the record includes no evidence of TCF investigating FAVs with Market after 2002, the evidence suggests that, if TCF had, it likely would have revealed the fact that appraisers were not involved in the quality review process. Market's representative testified freely to that fact in this litigation and there is no evidence that Market ever specifically referenced that statement in The Hybrid Approach during its marketing efforts such that it could have a motivation for concealing that appraisers do not participate in quality review. Rather, counsel for Market indicated at oral argument that it would not have made sense for Market's position to have been that appraisers reviewed every FAV, because the purpose behind FAVs was to offer a less expensive alternative to true appraisals, the lower cost of which was possible because it did not involve a licensed appraiser.

TCF's only support for its argument that it exercised reasonable diligence is that Meyer's letter to Mara amounted to reasonable diligence.  But that inquiry was two years before TCF began to uncover numerous instances of discrepancies between FAV and appraisal value, which should have triggered additional investigation by TCF.  Mara's response was not specific enough about the role of appraisers for it to have been reasonable for TCF to see no need to further investigate the use of appraisers in Market's FAVs.  Meyer testified that Mara assured him only that the single disparity between the FAV and an appraisal that Meyer raised with Mara was an "aberration" and that the quality review process was sound.  (Meyer Dep. 49.)  The exchange made no mention of the role of appraisers in any part of the quality review process.  (*Id.*)  If anything, Mara's assurance about the effectiveness of the quality review process would likely be deemed to be responsive to the specific aspect of FAVs that Meyer mentioned in his letter – which was not whether appraisers were involved in the quality review process, but whether drive-bys were being conducted by real estate agents.  (*See* Melendez Decl., Ex. E (letter from Meyer to Mara in 2002, in which Meyer observes that "[i]t seems unlikely that there would be this much disparity in the values, since in the FAV process, a real estate broker or appraiser is actually the one doing the driveby."); *see also* Meyer Dep. 49 (Mara responded to Meyer, assuring him that any disparity was an aberration and that the quality review process was sound).)  This specific inquiry indicates that TCF had raised specific concerns with Market in the past, suggesting that it could have done so again in 2004 and 2005 with regard to the role of appraisers if TCF truly considered that the failure to have appraisers review FAVs was causing the disparities it observed.

Thus, no reasonable jury could conclude that failing to investigate the problems with FAVs after becoming aware of additional, numerous, discrepancies in 2004 and 2005 was reasonably diligent, or that Meyer's inquiry to Mara demonstrated reasonable diligence in light of TCF's 2004 and 2005 concerns, which ultimately led it to cancel the Agreement. The Court thus concludes that the cause of action for TCF's fraud claims accrued, under the discovery rule, before September 2005 and TCF's fraud-related claims are barred by the statute of limitations.

### 2. Contract Claims

Under Minnesota law, causes of action for contract-based claims "accrue at the time of the breach, even though actual damages occur later." *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 956 (D. Minn. 2000), *aff'd*, 286 F.3d 1051 (8th Cir. 2002) (quoting *Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 803 (Minn. 1989)). Here, TCF alleges that Market breached the Agreement by engaging in grossly negligent conduct, including ignoring various factors that would have made the value estimations more accurately. (First. Am. Compl. ¶¶ 50-51.) TCF alleges that Market breached a duty of good faith and fair dealing by not dealing "fairly and in good faith with TCF." (*Id.* ¶ 59.) For both of these claims, the statute of limitations began to run before September 2005, given that any breach would have occurred during the operation of the Agreement, which was

terminated in June 2005.[3]  TCF's contract-based claims are thus timely only if the Court

concludes that tolling on account of fraudulent concealment is warranted.

### 3.       Negligent Appraisal

The damages rule governs when TCF's negligent appraisal claim statute of

limitations began to run:

> A cause of action accrues and the statute of limitations begins to run when
> the cause of action will survive a motion to dismiss for failure to state a
> claim upon which relief can be granted.  A cause of action survives a
> motion to dismiss so long as "some" damage has occurred as a result of the
> alleged malpractice. In addition, the running of the statute does not depend
> on the ability to ascertain the exact amount of damages.

*Herrmann v. McMenomy & Severson*, 590 N.W.2d 641, 643 (Minn. 1999) (footnotes

omitted).  Courts are to interpret "damage" broadly, meaning "any compensable damage,

whether specifically identified in the complaint or not."  *Antone v. Mirviss*, 720 N.W.2d

331, 336 (Minn. 2006).

Defendants argue that any damages to TCF on account of negligent appraisal

occurred the moment it received FAVs that were allegedly negligently performed.

Ostensibly, this is because TCF argues that those FAVs induced it to award loans in

amounts greater than the value of the security interest.  TCF does not respond to this

argument, but Defendants' argument is well-supported by Minnesota case law, in which

courts have fairly consistently held that "damages," construed broadly for statute of

---

[3] Defendants claim that any breach must have occurred before February 2005 because
that is when TCF received its last FAV from Market.  It is not necessary to determine exactly
when the last moment of breach could have been for the purposes of this order because either –
February or June 2005 – is more than six years before TCF brought this action in September
2011.

limitations purposes, accrue when something occurred that gave rise to an injury, even if the party had not actually suffered any pecuniary loss at that point. *See Antone*, 720 N.W.2d at 336 (client's legal malpractice action against attorney for negligent preparation of an antenuptial agreement that failed to protect client's interest in any marital appreciation to his premarital property accrued, and six-year limitations period began to run, when the agreement took effect, upon client's marriage, rather than when client's wife was subsequently awarded a portion of the marital appreciation of client's premarital property in a marital dissolution proceeding, and thus action was time barred; at the time of his marriage, client lost the legal right to unfettered ownership in his premarital property); *Herrmann v. McMenomy & Severson*, 590 N.W.2d 641, 643-44 (Minn. 1999) (where defendant law firm allegedly did not advise its plaintiff clients that the tax laws prohibited them from engaging in certain transactions with their employee pension plan and plaintiff argued that statute of limitations should not commence before plaintiff began actually expending money to address prohibited transactions because it did not know the transactions were illegal, statute of limitations commenced when the first illegal transaction occurred, because it rendered plaintiff liable for accompanying taxes and a cause of action against attorneys at that point would have survived a motion to dismiss); *see also Klempka v. G.D. Searle & Co.*, 963 F.2d 168, 170 (8th Cir. 1992) (applying damages accrual in negligent products liability action and holding it applied when plaintiff first noticed injury, not later when she discovered infertility caused by the product, reasoning, "[a]lthough [plaintiff] did not know the full extent of her injuries, she clearly knew in February 1977 that she was injured and that the injuries were, in her

physician's opinion, caused by the Cu–7.  A plaintiff who is aware of both her injury and the likely cause of her injury is not permitted to circumvent the statute of limitations by waiting for a more serious injury to develop from the same cause.").

These cases indicate that the damages rule would place the commencement of the statute of limitations before September 2005.  Although the Court contemplated in its 2012 order that TCF might be able to prove that it did not actually suffer damages until it sought to foreclose on the relevant properties, TCF has not made an argument or presented evidence to that end before the Court on this motion.  Thus, the Court concludes that no reasonable jury could find that any damages on account of a negligent appraisal accrued after September 2005, and thus TCF's negligent appraisal claim accrued over six years before this action commenced.  As with TCF's contract claims, its negligent appraisal claim is thus timely only if the Court concludes that tolling on account of fraudulent concealment is warranted.

### B.    Tolling for Fraudulent Concealment

Having concluded that the statute of limitations has run on TCF's claims, the Court next considers whether the statute of limitations for these claims should be tolled on account of fraudulent concealment.  Under Minnesota law, "[f]raudulent concealment tolls the statute of limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect."  *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 918

(Minn. 1990).[4]  In order for fraudulent concealment to apply, the "very existence of the facts which establish the cause of action" must have been fraudulently concealed.  *Id.* "Merely establishing that a defendant had intentionally concealed the alleged defects is insufficient; the claimant must establish that it was actually unaware that the defect existed before a finding of fraudulent concealment can be sustained."  *Id.* at 919; *see also Veldhuizen v. A.O. Smith Corp.*, 839 F. Supp. 669, 674-75 (D. Minn. 1993).

The plaintiff bears the burden of proving that they did not discover the facts giving rise to the cause of action, *see Veldhuizen*, 839 F. Supp. at 674-75, and that "the concealment could not have been discovered sooner by reasonable diligence on his part," *Wild v. Rarig*, 234 N.W.2d 775, 795 (1975).  "[N]ormally in a statute of limitations context fraudulent concealment and a plaintiff's due diligence are questions of fact unsuited for summary judgment."  *Hines v. A.O. Smith Harvestore Prods., Inc.*, 880 F.2d

---

[4] The Court observes that this standard is the same as that for determining whether the statute of limitations can be tolled for fraudulent concealment.  *See Wild v. Rarig*, 234 N.W.2d 775, 795 (Minn. 1975) (setting out standard for fraudulent concealment: "for most causes of action fraudulent concealment of the existence of a cause of action will toll the statute of limitations, postponing the commencement of the running of the statute until discovery or reasonable opportunity for discovery of the fact by the exercise of ordinary diligence").  As the Minnesota Supreme Court observed in *Kopperud v. Agers*, 312 N.W.2d 443 (Minn. 1981), the rule that "fraudulent concealment of that cause of action will" toll the statute of limitations, "regardless of when a cause of action accrues . . . is necessary to achieve the result in nonfraud cases that the 'discovery rule' achieves in fraud cases" and that the "theoretical difference [between fraudulent concealment and the discovery rule] is that when the suit is for fraud, the statute does not begin to run until discovery, but when the suit is for another claim, the statute begins to run from the wrong but is tolled by defendant's fraudulent conduct."  *Id.* at 446-47. Although the Court above analyzed the application of the discovery rule for the purposes of determining when TCF's fraud-based claims accrued, the Court will analyze here whether fraudulent concealment may toll the statute of limitations on TCF's remaining contract-based and negligent appraisal claims.  This analysis is slightly distinct from the above analysis in that the Court considers the extent to which the Mara statement fraudulently concealed the facts giving rise to TCF's causes of action for its contract-based and negligent appraisal claims, rather than the fraud-related claims.

995, 999 (8th Cir. 1989).  However, where "the evidence leaves no room for a reasonable difference of opinion, the district court may resolve fact issues as a matter of law," *Miles v. A.O. Smith Harvestore Prods., Inc.*, 992 F.2d 813, 817 (8th Cir. 1993).

TCF argues that it exercised reasonable diligence through Meyer's inquiry to Mara, and that it did not further investigate the adequacy of the FAVs on account of Mara's statement to Meyer, such that Mara's response to Meyer's inquiry fraudulently concealed the existence of any potential causes of action against TCF.  Market counters by pointing to the evidence indicating that TCF again developed concerns with FAVs in 2004, which ultimately led it to cancel the Agreement, such that it was actually aware of the circumstances giving rise to the claims it now presents.

In its 2013 Order, the Court found that TCF had adequately alleged fraudulent concealment and due diligence:

> For three reasons, the Court finds that it is premature to determine if TCF exercised due diligence. First, without more evidence, it is unclear how easily or if TCF could have determined the inaccuracies in Market's FAVs. Second, TCF's complaint centers around Market's practices in conducting the FAVs, not simply the results of Market's practices, and it may have been particularly difficult for TCF to independently discover the practices that Market used. Third, when TCF complained in 2002 about the inaccuracies in one FAV, Market may have "lulled" TCF into believing that any problems with FAVs were unique and, if present, would be fixed.

*2013 TCF Order*, 2013 WL 53837, at *3.  Now, based on the evidence revealed through discovery, the Court concludes that no reasonable jury could find that TCF was reasonably diligent in uncovering the bases for its claims.  First, the record indicates that TCF did in fact know of the discrepancies in 2004 and early 2005, such that no reasonable jury could conclude that TCF was "actually unaware that defects existed" in

the FAVs, as is required for fraudulent concealment.  *See Veldhuizen*, 839 F. Supp. at 674.  This alone is sufficient to defeat tolling on account of fraudulent concealment.  *Cf. Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 878 (8th Cir. 2000) (plaintiff's "generalized allegations that [defendant] fraudulently misrepresented" the effectiveness of a preservative did not "constitute fraudulent concealment," where the plaintiff, at all times, "had access to each of the very facts that establish Marvin's breach of contract action, namely [the preservative's] alleged failure to prevent rot on defendant's products").

Second, the July 2004 memo does indicate that TCF suspected that the discrepancies were due to differing **practices** in conducting FAVs, such that a reasonable jury would have expected it to investigate these practices with Market.  The memo sent to Meyer in 2004 by Powers observed that the reasons for disparities between FAVs and appraisals were unclear, but suggested that the disparities could stem from Market using different models for FAVs as compared to AVM.  (*See* Defs.' Ex., Ex. 10.)  It is not clear, and the record sheds little light upon, how difficult it would have been for TCF to "independently discover the practices that Market used," *2013 TCF Order*, 2013 WL 53837, at *3, because TCF made no attempt whatsoever.  Where the record indicates that TCF suspected that Market's methods consistently had a negative effect on the quality of FAVs but failed to make any efforts to investigate those methods, no reasonable jury could find that TCF exercised reasonable diligence.[5]

---

[5] Defendants additionally argue that TCF has an obligation, as a consumer mortgage lender, to adequately test appraisal values it uses in assessing prospective mortgages, and that it

(Footnote continued on next page.)

Finally, the record now indicates that the Mara statement did not effectively quell TCF's concerns about FAVs' reliability, because TCF developed new concerns in 2004 which led it to terminate the contract. As of 2004 and 2005, TCF knew that many of the FAVs were far off from actual appraisals of the same property, but did not communicate with Market about this and instead decided to terminate the Agreement on account of its concerns. The record further indicates that TCF actually contemplated bringing some sort of breach of contract action against Market in 2008 on account of the disparities between the FAVs and actual appraisals. Even if the evidence did not indicate that TCF **actually knew** about the defects in FAVs beginning in 2004 and 2005 despite Mara's assurances in 2002, no reasonable jury could conclude that it would have been reasonable to **rely** on Mara's assurances after discovering the additional, numerous discrepancies in 2004 and 2005.[6]

_____

(Footnote continued.)

did so here, which should have alerted it to the problems TCF now claims were part of Defendants' development of FAVs. TCF does not address this argument, and the Court considers it to additionally support Defendants' arguments on the issue of fraudulent concealment, but that it is not dispositive.

[6] TCF points to *Thompson v. Lutheran Bhd.*, Civ. No. 01-2433, 2003 U.S. Dist. LEXIS 26513 (D. Minn. Oct. 23, 2003), for the proposition that a buyer or customer's alarm at a product returning less value than anticipated does not amount to knowledge of a defect or trigger a duty to investigate for the purposes of tolling on the basis of fraudulent concealment. (*See* Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 7-9.) There, the court considered a variety of fraud and negligent misrepresentation claims brought after plaintiffs, upon the guidance of defendant financial advisor, surrendered one life insurance policy for newer policies and the value of the new policies declined. *Thompson*, 2003 U.S. Dist. LEXIS 26513, at *2-4. The court denied the defendant's motion to dismiss, finding that the plaintiffs' complaint adequately alleged facts upon which it could be found that the defendant made representations which concealed defects with the policies and that plaintiffs did not have knowledge of those defects and exercised reasonable diligence in seeking to uncover those problems. *Id.* at *22-25. Specifically, the court held that the fact that one plaintiff was "alarmed" when he received an update on his policies did

(Footnote continued on next page.)

- 28 -

TCF argues that, although it may have known of the disparities in 2004 and 2005, it did not know about the specific falsity with regard to the appraiser involvement in quality review, which it claims it did not discover until 2010 and did not confirm until 2014.   But the "facts constituting" TCF's claims, *see Hope*, 457 F.3d at 790, for the purposes of fraudulent concealment are not limited to the allegation that Market misrepresented the extent of appraiser involvement in developing FAVs.   That is the basis of TCF's fraud-related claims discussed above, but TCF's contract and negligent appraisal claims are based on a wide variety of defects with the FAVs: that they did not include enough information, they were negligently made because they ignored relevant pieces of information, and Market assured TCF that its practices generally would not produce a "significant difference" between the FAV value and the appraisal value.   (First Am. Compl. ¶¶ 50-51, 64-65.)   These are the facts constituting TCF's claims, and TCF

_____

(Footnote continued.)

not "provide him actual notice of his claims based on a failure to disclose," and instead merely indicated that he might have been damaged.   *Id.* at *23-24.   The court found that even if the alarm triggered a duty to investigate, there was a fact question not amenable to disposition on a motion to dismiss as to whether the plaintiffs could have discovered the basis of their claims sooner because, after receiving the alarming update, the plaintiff "**did** attempt to make a reasonable investigation." *Id.* at *26 (emphasis added).   The Court is not persuaded that this case counsels in favor of fraudulent concealment here, or specifically that TCF's observation of numerous problems with FAVs in 2004 did not trigger a duty to investigate further.   An individual's alarm at the decreasing value of a life insurance policy is very different from a national bank's internal discovery, upon analysis and comparison of appraisal and appraisal alternative results, that one alternative to appraisal consistently results in higher value estimates. A reasonable jury could conclude that the former is not notice of any actual defect (life insurance policies drop in value without wrongdoing), and that it therefore does not trigger a duty to investigate.   Here, where TCF relied upon appraisals or appraisal alternatives for its consumer lending business and took care to monitor the reliability of various methods of those estimates, no reasonable jury could conclude that it was reasonable to not investigate the possible reasons for the disparate values produced by FAVs.

has not presented sufficient evidence to permit a reasonable jury to find that TCF did not or should not have known these facts before September 2005.

In sum, TCF was actually aware of the defects giving rise to its claims – the frequent disparity between FAV and appraisal values – before September 2005.  Given TCF's renewed concerns about FAV reliability in 2004 and 2005, no reasonable jury could conclude that not further investigating the cause of these problems was an exercise of due diligence or that it was reasonable to decline to investigate on account of Mara's response to Meyer's letter in 2002.

The Court thus concludes that TCF is not entitled to tolling on the grounds of fraudulent concealment and will grant Market's motion for summary judgment on the grounds that the statutes of limitations bar all of TCF's claims.  Because the Court dismisses all of TCF's claims on statute of limitations grounds, it need not address the parties' arguments regarding the merits of TCF's claims and will deny both TCF's partial motion for summary judgment[7] and Market's motion to exclude TCF's expert as moot.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion for Summary Judgment [Docket No. 70] is **GRANTED**.

---

[7] To the extent that, as part of its partial motion for summary judgment, TCF argues that Market has waived its statute of limitations argument, the Court concludes that this defense was adequately raised and is not waived.

2.      Plaintiff's Motion for Partial Summary Judgment [Docket No. 58] is

**DENIED**.

3.      Defendants' Motion to Exclude Expert Testimony [Docket No. 63] is

**DENIED** as moot.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  October 14, 2014                    ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                            United States District Judge